Davis and others *v.* Brown and others.

*(Circuit Court, S. D. New York.   May 25, 1881.)*

1 REISSUE No. 8,589—GRAIN DRILLS—VALIDITY—INFRINGEMENT.

Reissued letters patent No. 8,589, granted February 18, 1879, to Charles F. Davis, for improvement in grain drills, *held valid* and *infringed.* Complainant's invention being a grain drill, constructed to shift or change the seeding shoes from a straight to a zigzag line, or *vice versa,* and to admit of their being raised separately or all together, and consisting in connecting the shoes by means of drag-bars and yokes to a crank-shaft mounted on the forepart of the main frame, and by means of levers, one for each shoe, in such a manner to a rear shaft, actuated by a lever within reach of the operator, as to permit of all the shoes being raised simultaneously, such shoe levers having also independent levers or handles, so that each may move irrespective of any other, the lower end of the operator's lever having connected to it a rack-bar, taking into a pinion fastened on the end of the crank-shaft, and, when actuated, shifting the shoes into a straight or zigzag line, *held infringed* by defendant's device, in which every alternate shoe is connected to an immovable part of the frame, and every other alternate shoe is connected to a swinging cross-bar, actuated by a lever at the rear of the machine, to shift the shoes attached to such movable frame or cross-bar, and in which springs are arranged to hold the movable shoes normally in a straight line, and urge them into a straight line, when the power exerted upon the operator's lever in shifting is released.

*W. F. Cogswell* and *S. D. Bentley,* for plaintiffs.

*B. F. Thurston* and *Wood & Boyd,* for defendants.

BLATCHFORD, C. J.   This suit is brought on re-issued letters patent No. 8,589, granted to Charles F. Davis and William Allen, February 18, 1879, for an "improvement in grain drills," the original patent having been granted to said Davis, as inventor, February 18, 1868. The following is the specification of the re-issue, reading what is inside of brackets and what is outside of brackets, omitting what is in italics:

"Figure 1 represents a top *plan* [or top view] of the drill with the seed-box removed, but its position shown by *red* [dotted] lines to show the parts underneath it.   Figure 2 represents the crank-rod or shaft to which the front ends of the drag-bars are attached, *when* detached from the machine.   Figure 3 represents an end view of the drill with the wheels removed, to show the parts behind it, and representing, by *black,* [full and] dotted, *and red* lines, the several operative parts, and their positions under the changes of the machine or of its parts. Similar letters of reference, *where they occur in the separate figures,* denote *like* [corresponding] parts in all *of* the *drawings,* [figures.]   The object and purpose of my invention *are* [is] to shift or change the seeding-shoes or hoes from a straight to a zigzag line, and *vice versa;* and, further, to so hang the shoes or hoes as, in addition to *this* [the] shifting process, to admit of being raised   separately, or the whole series together, as may be found necessary.

* * * Upon an axle, A, supported *in* [on] the usual carrying wheels, B B, is mounted a main frame, C, and on the main frame a seed-box, D, the slides of which may be operated in any' of the well-known ways. In bearings, E, in the front portion of the main frame, is hung, so as to rock or turn therein, a zigzag- or crank-shaft, F, shown detached in figure 2, and to the *cranks* [crank] or wrists, *a a a*, of this shaft, are connected, *seriatim*, the drag-bars, *b b b*, by means of bows or yokes, *c*, each bow or yoke taking two of said wrists, as shown in figure 1. To the rear ends of these drag-bars, *b*, are attached the shoes or hoes, G, in any of the usual well-known ways. In the projecting rear portion of the main frame, C, there is hung a shaft, *d*, upon which there is a lever, *e*, by which it can be rocked or rolled in its bearings. At suitable distances upon this shaft, *d*, there is placed a series of levers, *f f*, one for each shoe or hoe, which are kept in their proper positions on the shaft by pins, T T, or other suitable devices, but which can be moved independent of the shaft, or of each other, or all together, as will be explained. The levers *f*, have a hub or swell, *g*, at their central portions, where they are slipped onto the shaft, *d*, and into each one of these hubs is set a pin, 2, which is above the pins, T T, in the shaft, so that each lever can be turned upon the shaft; but when the shaft is rocked or turned, then all the levers are worked simultaneously. To the forward ends of these levers, *f*, the shoes or hoes are respectively connected by a link or hinged rod, *h*, the rearward projecting ends of said levers serving as handles for the operator to seize and work separately, when necessary to do so, or he can raise the whole series by seizing and working the lever, *e*. One end of the shaft, *d*, projects through the timber of the main frame, for convenience of placing the parts, and upon it is a lever, H, and a' spring-locking lever, *i*, connected with it, both of which levers the operator may grasp at once, and by pressure, first unlock the catch and then move the main lever, H, and the shaft, *d*, as well as the parts connected with it. The catch or locking lever, *i*, locks into or against *a* [the] stop-plate, *j*, on the main frame, when not otherwise controlled. The upper portion of the lever, H, serves as a handle to work it by, and to the lower end of it is pivoted a rack-bar, [or connecting-rod,] *m*, which takes into a pinion, *n*, fastened on the end of the crank or zigzag shaft, F, and when the pinion, *n*, is turned, the crank-shaft is also turned, and as it is turned it shifts the shocs or hoes into a zigzag or a straight line, as the case may be. When the lever, H, and the zigzag shaft, F, [and the connecting bar, *m*,] and their several connected and operative parts, are in the positions shown by the *black* [full] lines in figures 1 and 3, the shoes or hoes, G, are then in a straight line across the machine; but when the lever, H, is shifted into the position shown by the *red* [dotted] lines in figure 3, it turns the shaft and moves the parts connected with them, and the shoes or hoes will then stand in a zigzag line across the machine, as shown by the *red* [full] lines, or in what may be termed two lines, one in advance of the other, and [in order] that the shoes or hoes may be thus moved into one or two lines, and still be susceptible of being raised up separately, or in their series capacity, their connections and [the] attachments must all be hinged or yielding. When there is an odd number of shoes or hoes on the machine, the odd one should be in the rear series, in which case there would be no necessity of locking the lever, H, when the shoes *were* [are] so

arranged, as the greater resistance on the greater number would always keep them so; but if an even number of shoes be used, and an equal number in each row, then the lever would have to be locked or fastened in both of its positions. It is obvious that other mechanical devices may be used for shifting the shoes or hoes from a straight into a zigzag line, or *vice versa.* I have devised several ways of accomplishing this movement. [The rack-bar or connecting-rod, *m*, may be used for this purpose, and thereby the shoes or hoes may be shifted from a straight to a zigzag line, or *vice versa*, said connecting-bar, *m*, being held in position, if desired, by any of the usual mechanical devices for that purpose; second, by means of] *as, for instance*, a sheave, pulley, or chain-wheel, [which] may be keyed to the end of the crank-shaft, and to this wheel or sheave a chain may be attached, and, passing around it, *extend thence to the lever*, so that, by *working the lever*, [means thereof,] the same effect *would* [can] be attained by the rack and pinion.

"Another plan may be as follows: A crank or cross-arms may be placed on the turning shaft, as by means of [a] connecting [rod or] rods *which connect the cranks or arms with the levers*, the shaft may be turned [by the operator] and the shoes thus thrown into a straight or zigzag line, as may be desired; or, instead of [the crank shaft] *crank-shafts to shift the shoes*, the shoes may be united in sets to different bars, which may be straight, both bars being united to cross-bars or heads at their ends. Now, by shifting [the relations of] these two bars, [and by the means aforesaid, or by the connecting-rod, *m*, the operator can] *they will* shift the shoes [or hoes] attached to them, *and change them* into the *positions* [position] hereinabove described. When the hoes are set in a zigzag line, as above mentioned, and are in that position raised up, a pin, 3, in the extreme end of the shaft, *d*, will take against a pin, 4, in the lever, H, and thereby shifting the hoes into more nearly a straight line as they rise, or into quite a straight line, depending upon the extent to which they are raised."

Reading in the foregoing what is outside of brackets, including what is in italics, and omitting what is inside of brackets, gives the text of the specification of the original patent. The claims of the re-issue, six in number, are as follows:

"(1) The shoes or hoes of a seed-planter attached to the main frame, substantially as described, whereby they may be simultaneously shifted from a straight to a zigzag line, or *vice versa*, by a single movement. (2) The shoes or hoes of a seed-planter attached to the main frame, substantially as described, in combination with a lever, or its equivalent, whereby they can be shifted, at the pleasure of the operator, from a straight to a zigzag line, or *vice versa*. (3) The shoes or hoes of a seed-planter attached to the main frame, substantially as described, in combination with a rod, or its equivalent, whereby they can be shifted from a straight to a zigzag line, or *vice versa*. (4) A series of shoes or hoes that are capable of being changed from a straight to a zigzag line, or *vice versa*, in combination with independent levers connecting said shoes or hoes with the lifting-bar, whereby they can be raised by the operator individually or as a whole, substantially as described. (5) The shoe

hinged to both its drag-bar and its individual lever, so that it can be raised or lowered, in either of its changed positions, by a lever that is permanently located, substantially as described. (6) In combination with a series of shoes or hoes that are capable of being changed by the operator at the rear of the machine from a straight to a zigzag line, or *vice versa*, a shaft and lifting lever connected therewith, whereby the whole series can be raised at once by the operator to pass obstructions, substantially as described."

The claims of the original patent were three in number, as follows:

"(1) So attaching the shoes or hoes of a seed-planter to the main frame, as that by means of a lever, or its equivalent, said shoes may be shifted from a straight to a zigzag line, or *vice versa*, at pleasure, substantially as described. (2) In combination with a series of shoes or hoes that are capable of being changed from a straight to a zigzag line, or *vice versa*, the so connecting of said shoes by independent levers to the lifting-bar, as that they be raised by the operation individually or as a whole, substantially as described. (3) Hinging the shoe to both its drag-bar and to its individual lever, so that the shoe may be raised and lowered, in either of its changed positions, by a lever that is permanently located, substantially as described."

Claim 1 of the original is substantially the same as claim 2 of the re-issue. Claim 2 of the original is substantially the same as claim 4 of the re-issue. Claim 3 of the original is substantially the same as claim 5 of the re-issue. The original specification stated that there were two objects in the invention. One was stated to be to shift or change the seeding shoes or hoes from a straight to a zigzag line, or *vice versa*. It is plain from the text, and from the mechanical construction of the apparatus, that the shifting was to be done by the operation from the rear of the machine, and without stopping the machine, and that all the shoes which were to be shifted were to be moved simultaneously and not successively.

The particular method shown was to have in the front part of the machine a turning-shaft, with cranks on it so arranged that the shaft did not have a straight, continuous axis, but had sets of axes in different lines, alternating, so that yokes being attached, each to two of the cranks, and each two of the cranks having axes in a different line from the line of the axes of the next two adjoining cranks, the yokes being of substantially equal length, and being connected by drag-bars at the rear ends of the drag-bars to the shoes, a rotating movement given to the crank-shaft would shift the shoes by moving all of them, each alternate shoe moving in an opposite direction from the direction in which every other alternate shoe moved, and thus a space being opened or closed of double the distance through which any shoe traveled. The particular method of producing the shift-

ing, shown in the drawings and model, was to have a cross-shaft in the rear part of the machine, and an upright lever on the end of it extending up for a handle, and below having pivoted to it a bar running forward, and made in its forward end into a rack, working into a pinion on the end of the crank-shaft. Moving the lever worked the rack and pinion, and turned the crank-shaft and shifted the shoes. The extent of the extreme rotating movement of the crank-shaft was about half a circle back and forth. It is perfectly obvious that when the principle of the shifting of the shoes by so attaching them to a shaft having a rotating movement that such rotating movement of the shaft would shift the shoes attached to the shaft, was embodied in machinery, and one method of imparting such rotating movement to the shaft was embodied in machinery by a lever acting through a rod and a rack and pinion, it was mere mechanical skill, and not invention, to substitute for the lever, rod, rack, and pinion some other mechanical means of giving such rotating movement to the shaft.

Accordingly, the original specification says that it is perfectly obvious that other mechanical devices may be used for shifting the shoes. It then suggests, as one mode, to have the lever, instead of working a rod, rack, and pinion, work a chain extending from it to and around a sheave or pulley keyed on the end of the crank-shaft. It also suggests that "a crank or cross-arms may be placed on the turning shaft, and by means of connecting rods which connect the cranks or arms with the levers the shaft may be turned." This evidently means that a crank or a cross-arm may be put on the end of the shaft in place of the pinion, and a connecting rod be run from the crank or the cross-arm to the lever, and be worked by it to rotate the shaft. It also says that "instead of crank-shafts to shift the shoes, the shoes may be united in sets to different bars, which may be straight, both bars being united to cross-bars or heads at their ends," and that "by shifting these two bars they will shift the shoes attached to them." The idea here is to dispense with the crank-shaft, and fasten some of the shoes to one straight bar and some to a second straight bar, and have cross-bars or heads at the neck of the two bars so uniting them that the bars may be shifted to shift the shoes. The idea seems to be preserved throughout of having a lever at the rear part of the machine, at the end of a connecting rod or a chain, and working thereby a pinion or a pulley on a shaft or two bars with shoes attached to them.

The defendants have a machine in which every alternate slide is

connected to an immovable part of the frame, and every other alternate slide is connected to a swinging cross-bar, which hangs down so as to have a rotating motion back and forth in the arc of a circle by reason of its being hung in bearings in the sides of the frame. A rod extends from nearly the middle of the width of the swinging cross-bar to the rear part of the frame, behind the line from which the shoes are suspended, which rod is supported in the center of its length, and terminates at its rear end in a handle, so that an operator can work it, and by pulling it shift simultaneously all the shoes that are attached to the swinging cross-bar. Two coiled springs are so arranged that when the rod is pulled the springs are compressed, and when the rod is released the action of the springs tends to throw the swinging cross-bar, and the shoes attached to it, towards the front of the frame again, restoring them to the position from which the pulling of the rod moved them. Thus, only alternate shoes are shifted, but the advantage of simultaneously changing the relative positions of the toes of the shoes to each other, and thus making a wider space in a straight line between any two toes at one time than at another, is secured, as in the plaintiff's arrangement.

In the defendants' machine the shoes are so set that their toes are never in a straight line across, but, when nearest to each other, are somewhat out of a straight line, and the pulling of the rod causes the distance between them to increase. The shoes which move, in increasing such distance, do so through the rotating motion to and fro of the swinging cross-bar to which they are attached, such motion being imparted by the pulling, at the rear of the machine, of the rod attached to the swinging cross-bar. In the plaintiff's machine the shoes which move in increasing such distance do so through the rotating motion to and fro of the crank-shaft to which they are attached, such motion being imparted by the pushing, at the rear of the machine, of the rod that carries the rack, the rod being worked by a lever. It makes no difference, so far as the use of the real invention of Davis is concerned, that in the defendants' machine only alternate shoes are shifted, and not all the shoes, and that the shoes which are not shifted are fastened to an unmoving bar, and that the actuating rod is in the length of the swinging cross-bar, and not at one end of it, and that the rotating motion of the points where the shoes are attached is accompanied by a hanging down of the swinging cross-bar, instead of having the bearings in the line of its axis, and that the actuating rod is pulled directly at its rear end instead of being pushed through a lever, and that the shoes are retracted by

springs, aided by the pushing of a rod, instead of by the pulling of a rod through a lever, and that the shoes are not nominally out of a straight line. These minor matters are all aside from the real invention of Davis, as disclosed by his original specification.

The next question is, what is secured by the claims of the patent, in view of anything shown to have existed before? Various alleged prior inventions and patents are set up in the answer. Testimony appears to have been taken only as to those of Powers, Slander, and Uring, in respect to shifting arrangements. The latter two were not insisted on at the hearing, and are not mentioned in the defendants' brief. Anticipation by Powers is strenuously urged as to the shifting arrangements. It is also urged that the defendants have done in that respect only what Powers did before Davis. Davis carries back his invention to September, 1866. Whatever Powers did he did in 1862. He was engaged in that year in making and selling farm implements, at Madison, Wisconsin. During the winter of 1861–2 and the spring of 1862 he was selling these grain-drills, with iron drag-bars. During the season of 1862, noticing the working of drills in the field, he conceived the idea that the shoes could be put into single and double ranks by a more easy method than then used. He worked out a plan and made a model of it, and applied for a patent thereon. The application was filed November 10, 1862. The patent was ordered to issue December 6, 1862, but was never issued. Why, does not appear. The specification filed states that the "invention consists of a device to enable the shovels or plows of a drill to be set in single or double rows or ranks, with greater ease and facility than hitherto." The method described, and shown in the drawings, is to have a cross-row of stationary shovels; a cross-row of other shovels attached to a cross-bar. This cross-bar is arranged at each end of it to slide to the extent of eight inches to and fro in a groove, and thus two rows may be made; or the sliding cross-bar may be set at a point where all the shovels are in a line, and thus one row be formed. The movable cross-bar is secured, when set, by bolts.

The claim covers "the method of double and single ranking the drill-teeth, by the adjustment of the sliding cross-bar, A, to which are attached the alternate drill-teeth or shovels to different positions between the side pieces of the frame." The description states that "by this device double or single ranking can be effected in a moment, instead of more tedious processes of other similar machines;" and that "double and single ranking is a highly-important feature in a drill to adapt it to different soils and circumstances." It is clear

that this shifting could not be produced in Powers' apparatus by an operator riding on the machine, nor without stopping the motion of the machine. There was no rod or means of actuating the sliding cross-bar, except to take hold of it by the hand, and slide it and fix it in place by setting movable bolts. Davis' actuating lever has connected with it a spring-locking lever, so arranged that both levers can be grasped at once; and, by pressing the locking lever towards the other lever, a catch is unlocked, so that the main lever can be moved. In the defendant's machine there is a locking device on the actuating rod at about the center of its length. This automatic simultaneous shifting device is a marked feature in both the plaintiff's and defendant's arrangements, and is wanting in the foregoing structure of Powers. Powers put the foregoing shifting arrangement "onto two or may be three drills" which he had on hand. He testifies to the use of two of them, and says they worked perfectly so far as changing the rank of the drill was concerned. He made a different style of drill for 1863, and then ceased to make drills.

We now come to what is more material. Powers says that "on one or more" of the machines containing the foregoing shifting arrangement he had the following device: He attached chains to the two ends of the sliding cross-bar and underneath, which chains went forward to the semi-discs of a rock-shaft in front of the front beam, to which was attached a hand-lever adapted to be reached and operated by the driver on the seat of the machine. By pulling this lever backward, the rock-shaft took up the chains, and brought the rear beam forward to the single-rank position. The lever was secured in position by a pin in a semi-circular guide, centering on the axis of the rock-shaft. When it was desired to double rank the shovels, the pin was removed, and the lever was allowed to sweep forward, which permitted the rear cross-beam to draw backward, when the drill was in motion, to double rank again.

Powers illustrates this arrangement by a drawing marked "Powers, No. 2." Powers says that he does not know what became of these drills; that he had taken out a patent on grain drills in 1862, before making said application; that he has no recollection of applying for a patent for the hand-lever shifting device; that that was got up after the application of November 10, 1862, was filed; and that he thinks he filed an application for another patent on grain-drills after the application of November 10, 1862. He testifies as follows:

"*Cross-question* 32. At what season of the year, and in what year, was this lever device attached to this machine above referred to? *Answer.* I think it was in the fall or early winter of 1862; most likely the latter part of November of that year. *Cross-question* 33. When was the machine used in the field, with all these attachments above described? *Answer.* It was used in the ensuing spring, I believe, but tried in the fall before, in earth, to see if the contrivance would work."

This is all that Powers says on this subject. He does not say that the machine with the hand-lever did work successfully, or that it was more than an experiment. The improvement of an actuating lever was a desirable one, yet no more were made. He does not say distinctly that more than one was made with the lever. His testimony as to use in the field is qualified by "I believe," and he tells of no other use but a trial, the result of which he does not give. He was not encouraged to make more or to apply for a patent, although he thought enough of the arrangement shown in the application of November 10, 1862, to make that application, and although he applied for another patent on grain-drills after the time when he alleges he devised the hand-lever arrangement.

Skinner gives no support to this hand-lever arrangement. He has no affirmative recollection of it. He remembers a drill, in Powers' shop, with a device by which the hoes were shifted from double to single rank, and *vice versa.* He saw the shaft made, but he does not remember the device for making it, except that there was a bar sliding horizontally, to which some alternate drag-bars were attached, and a stationary bar to which other alternate drag-bars were attached; nor does he remember what the device was for holding the movable bar in position. All this is referable to the machine described in the application for a patent, without the hand-lever arrangement.

Stowe testifies that in January, 1863, he thinks, he saw Skinner at Powers' shop, and they two saw a drill there with a device attached for shifting the shoes to single or double rank, and saw Powers work it with a lever which, when drawn back, moved the shoes forward by moving forward a sliding bar to which the shoes were attached.

Renter testifies to seeing at Powers' shop, during the fall of 1862, a grain-drill being built, which had a lever in the front part of the frame, with a roller, and a chain at each end of the roller, the chains running to a sliding bar, so that, by pulling the handle forward, it would bring the hoes into double rank. He was a workman for Powers at the time. He does not know what became of the machine. There was but one drill made so far as he knows.

Such recollection as Renter and Stowe testify to was evidently greatly stimulated by the exhibition to them of the drawing, "Powers, No. 2," and of a model of the arrangement. Their independent testimony is very weak. At most, however, whatever Powers did in the way of the actuating lever shown in the drawing, "Powers, No. 2," was a mere experiment. He acted as if he regarded it as of no value. It would have been of no value if it had been perfected. The reason why he threw it aside as valueless must have been because it was not perfected. The case is one falling within the principle of *Gayler* v. *Wilder*, 10 How. 477; *Hall* v. *Bird*, 6 Blatchf. 438; *Hartshorn* v. *Tripp*, 7 Blatchf. 120; *Cahoon* v. *Ring*, 1 Clifford, 592, 611, 612; and *Wilson* v. *Coon*, 19 O. G. 482; and not within the principle of *Coffin* v. *Ogden*, 18 Wall. 120.

What is shown in Powers' application of November 10, 1862, even if a perfected invention, embodied in working machines successfully used, does not anticipate claims 2 and 3 of the plaintiff's re-issue patent. Claim 2 of the re-issue is the same as claim 1 of the original. The defendants have thin shoes attached to the main frame, substantially as described in the original and re-issued patents, in combination with what is the equivalent of the Davis actuating rod, so that thereby the movable shoes, though not the immovable ones, are simultaneously shifted from one line to another, so that after the shifting all the shoes taken together, movable and immovable, form a line more or less zigzag than before. This was never accomplished, as a perfected invention, by any one before Davis. It is what Davis does and what the defendants do, and they thereby infringe claim 2 of the re-issue. The defendants' rod is within the plaintiff's arrangement. It is the material part of the plaintiff's simultaneously-actuating arrangement. Davis has the rod and the lever added to it. It is no invention to leave off the lever and retain the rod, and, instead of locking the lever, lock the rod. The lever in the one case pulls and pushes the end of the rod. The hand of the operator, in the other case, pulls and pushes the end of the rod. In having the rod and lever, Davis has the rod as well as the rod and lever. Claim 2 of the re-issue, being a claim to the lever, and so a claim to the lever and rod together, for the lever can shift nothing unless the rod is attached to it, is a valid claim, and is infringed if the rod, which is the material and essential part of it, is used, the rod being new with Davis as well as the lever. *Sister* v. *Father*, 8 Ell. & Blackb. 1004; *Sellers* v. *Dickinson*, 5 Exch. 312; *Adam.* v *Thayer*, 17 Blatchf. 468.

Claim 3 of the re-issue is also valid, and is not open to the objection that it is not warranted by the original specification. The rod extending to the rear of the machine is the material thing in the actuating mechanism, and is fully described and shown in the original patent as the rack-bar. It is called a "connecting rod," and a "connecting bar," in the re-issue and not in the original; but that is immaterial. It is a connecting rod and a connecting bar. It connects the actuating lever with the crank-shaft as in the defendant's machine; it connects the actuating hand of the operator with the swinging cross-bar. The re-issue, in speaking of mechanical devices for shifting the shoes, says:

"The rack-bar or connecting rod, *m,* may be used for this purpose, and thereby the shoes or hoes may be shifted from a straight to a zigzag line, or *vice versa;* said connecting bar, *m,* being held in position, if desired, by any of the usual mechanical devices for that purpose."

This statement is not found in the original specification; but the rack-bar, *m,* is described and shown in the original, and it is shown there as used to shift the shoes, and it does shift them when its rear end is moved, as it is, by the lever shown. A locking lever is shown to hold the actuating lever in position, and it is only the skill of the mechanic, when the lever is dispensed with and the bar is retained, to hold the bar in position by a locking device. No additional support is given to claims 2 and 3 of the re-issue by calling in the re-issue the rack-bar a connecting rod, or by omitting in the re-issue the words "which connect the cranks or arms with the levers," as those claims are warranted by the original specification.

Claim 1 of the re-issue is not to be so construed, in view of what existed in any machine made by Powers, according to what is shown in his application of November 10, 1862, if to be regarded as a complete invention, as to cover what is found in such machine. The claim is to be construed as a claim to the shoes attached substantially as described, and capable, so far as they are movable, of being simultaneously shifted by a single movement; such movement being produced by mechanism in the machine, and not requiring the stopping of the machine or the removal of pins or bolts. So construed, claim 1 is valid, and is infringed by the defendant's machine.

Davis put his shifting invention into use, and granted licenses under his original patent. The form in which he used it in model No. 2 was substantially the embodiment of the same invention shown

in the drawings of his patent. It had no crank-shaft, but had a bar with short cross-bars fixed to it, and cross-arms extending between the cross-bars and drag-bars attached to these arms, and he dispensed with the rack and pinion, and prolonged one of the cross-bars near the middle of the length of the first-named bar, and carried a rod from it to the rear of the machine, to the lower end of a hand-lever on a shaft from which the shoes were hung, and so worked the shoes; the first-named bar turning as a shaft in bearings, and each alternate drag-bar being so attached to the first-named bar as to have, when attached, a rotating motion in the arc of a circle in a direction opposite to that of its adjacent drag-bar. An unsuccessful attempt is made to show that Davis' shifting arrangement, as embodied by him in machines, was impracticable and worthless. But it is shown to have been practically applied in the form of model No. 2, and in other forms.

Davis is clearly shown to have been the first person to make a successful machine for changing the shoes of a grain-drill into substantially two lines from substantially one line, by a shifting movement applied to any of the shoes by mechanism operating on and from the rear of the machine, and worked without stopping the machine or seriously interfering with its operation. His invention and patent are entitled to a liberal construction. Claims 1, 2, and 3 of the re-issue are not anticipated, and the re-issue is not invalid because for a different invention from the original.

As to claims 4, 5, and 6 of the re-issue they are infringed, and the foregoing view of the *status* of the Davis invention shows that those claims are not anticipated by the Jessup apparatus, or by any other prior structure. There is a patentable combination and co-action between the devices for shifting the shoes and the lifting devices for raising the shoes, either simultaneously or individually. It may often be necessary, after shifting has been determined upon, and while it is in process of being effected, to suddenly raise one or more, or all, of the movable shoes, because of some apparent obstruction in the path. So a compound motion of the toe of the shoe results, composed of a backward or forward motion, and an upward motion, resulting from the co-action of shifting and lifting. As the *compound motion is a resultant of the two forces, so the two forces act in combination to produce the compound motion.*

There must be a decree for the plaintiffs for an account and a perpetual injunction, with costs.